**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lucille Ann DES JARDINS,
Defendant-Appellant.**

**No. 82–1247.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 1983.

Decided Sept. 21, 1984.

---

**1.** The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

Richard Marmaro, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Leonard I. Weinglass, Los Angeles, Cal., for defendant-appellant.

Before NELSON and NORRIS, Circuit Judges, and SOLOMON,* District Judge.

* The Honorable Gus J. Solomon, Senior District Judge for the District of Oregon, sitting by designation.

1. 31 U.S.C. § 1058, which punishes violations of 31 U.S.C. § 1101, provides:

Whoever willfully violates any provision of this chapter or any regulation under this chapter shall be fined not more than $1,000, or imprisoned for not more than one year, or both.

2. 31 U.S.C. § 1101 provides in part:

(a) Except as provided in subsection (c) of this section, whoever, whether as principal, agent, or bailee, or by an agent or bailee, knowingly—

(1) transports or causes to be transported monetary instruments—

(A) from any place within the United States to or through any place outside the United States, or

(2) receives monetary instruments at the termination of their transportation to the United States from or through any place outside the United States

in an amount exceeding $5,000 or any one occasion shall file a report or reports in accordance with subsection (b) of this section.

NORRIS, Circuit Judge:

Appellant, Lucille Ann Des Jardins, appeals from a two count conviction. The first count, brought under a provision of the Bank Secrecy Act, 31 U.S.C. § 1058,[1] charged appellant with willful failure to report transporting more than $5,000 in monetary instruments across United States borders as required by 31 U.S.C. § 1101,[2] another provision of the Act.[3] The second count, brought under 18 U.S.C. § 1001,[4] charged appellant with making a fraudulent statement to a customs agent. We affirm the section 1058 conviction, but we reverse the section 1001 conviction.

## I

On the night of appellant's arrest, Walter E. Hekala, Jr., a Special Agent with the United States Customs Service, was assigned to Los Angeles International Airport as part of a project designed to detect narcotics-related currency violations by outbound international passengers. When reviewing the ticketing for certain flights, Agent Hekala noticed that appellant's travel route was consistent with that frequently taken by narcotics couriers. From an airline employee, Agent Hekala also ascer-

3. Since appellant's arrest and conviction, title 31 of the United States Code has been recodified. Thus, 31 U.S.C. § 1058 is now 31 U.S.C. § 5322, and 31 U.S.C. § 1101 is now 31 U.S.C. § 5316. But, in recodifying title 31, Congress did not intend to make any substantive changes in these provisions, *see United States v. Booky,* 733 F.2d 1335, 1336 n. 3 (9th Cir.1984), and, as already indicated, appellant was convicted under the old provisions. Consequently, the recodification will not affect our analysis.

All references to these sections will employ the old denominations.

4. 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly or willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

tained that appellant was traveling with a companion, a Mr. Herbenson, and that appellant had checked two pieces of luggage.

After receiving this information, Agent Hekala went to the baggage area and retrieved appellant's bags. He examined these bags and found that one, bearing Herbenson's name, contained $5,000.

Agent Hekala then proceeded to the departure gate. On his way, he verified that posters advising passengers of currency reporting requirements were in place on walls and columns along the route to the departure lounge, and he made an announcement concerning the reporting requirements over the public address system in the lounge.

Shortly thereafter, Agent Hekala approached appellant in the jetway. After identifying himself, he asked appellant if she was carrying more than $5,000 out of the country. She stated that she was not. Agent Hekala asked appellant approximately how much money she was taking out of the country. She replied that she was carrying approximately $3,000. She was asked to verify the amount and produced approximately $2,500.

At this time, Herbenson, appellant's traveling companion, entered the jetway. Agent Hekala asked him if he was taking more than $5,000 out of the country. He replied that he was not. When asked how much he was carrying, Herbenson produced $4,500. Agent Hekala confiscated the money and advised Herbenson that he was under arrest for failing to report the fact that he was taking more than $5,000 out of the country.

Agent Hekala once again asked appellant whether she was carrying currency in excess of $5,000. When she again stated that she was not, Agent Hekala informed appellant that she would be searched and that she should thus disclose any additional currency she was carrying. She replied that she had already revealed all the currency in her possession.

During his questioning of Herbenson, Agent Hekala had examined Herbenson's ticket and discovered a claim check for a third bag. Agent Hekala now had an airline employee retrieve this bag. Agent Hekala's examination of the bag revealed that it bore appellant's name and contained a number of objects frequently used in smuggling narcotics, including rubber prophylactics, plastic bags, and glass pipettes.

Appellant was then taken to a customs clearance area where she was subject to a pat-down search. This search revealed an unexplained bulge around appellant's waist. The inspector conducting the search asked appellant to open the front of her slacks and to raise her girdle. Appellant complied, uncovering a money belt containing $8,000.

Subsequently, appellant was charged with and convicted of one count of violating 18 U.S.C. § 1001 and one count of violating 31 U.S.C. § 1101. She was sentenced to sixty months probation and a fine of $10,000.

## II

First, appellant challenges the search of her belongings and person which produced the evidence underlying her two convictions. Appellant argues that the search cannot be justified as a border search and was consequently impermissible in the absence of a warrant or probable cause. In the alternative, she argues that even if the search were a border search, and a warrant or probable cause was thus unnecessary, the search was unreasonably intrusive.

### A

The border search occupies a unique spot in fourth amendment jurisprudence. Unlike almost all other searches, *see Dunaway v. New York*, 442 U.S. 200, 213–14, 99 S.Ct. 2248, 2257–58, 60 L.Ed.2d 824 (1979); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), a border search may be initiated without a warrant, probable cause, or even articulable suspicion. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

Appellant contends, however, that the search of her belongings and person was not a border search. She argues that because she was exiting, rather than entering, the country at the time of the search, the border search exception is inapplicable.

We are inclined to agree. Traditionally, only searches of individuals entering the country have been considered border searches permissible in the absence of both a warrant and probable cause, and, in our view, an extension of the border search doctrine to searches of those departing the country is inappropriate. *See* 3 W. La-Fave, *Search and Seizure*, § 10.5, at 277–78 n. 7 (1978); Recent Developments, Criminal Law—Border Searches, 65 Georgetown L.J. 1641 (1977).

In *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), the Supreme Court explained why "searches made at our border ... by stopping and examining persons and property *crossing into this country* are reasonable simply by virtue of the fact that they occur at the border." *Id.* at 616, 97 S.Ct. at 1978 (emphasis added). The Court offered two justifications—one historical and one theoretical.

First, the Court noted that two months before the First Congress proposed the Bill of Rights, including the fourth amendment, it had enacted the nation's first customs statute. Act of July 31, 1789, ch. 5, 1 Stat. 29. Section 24 of this statute granted customs officials authority to search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed." In contrast, the same section permitted a search of "any particular dwelling house, store, building, or other place" only when a warrant founded upon "cause to suspect" had been issued. On this basis, the Court concluded that " 'it is clear that the members of [that Congress] did not regard [border] searches and seizures of this kind as

'unreasonable,' and they are not embraced within the prohibition of the amendment.' " *Ramsey*, 431 U.S. at 617, 97 S.Ct. at 1978 (quoting *Boyd v. United States*, 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886)).

Second, the Court argued that border searches were " 'reasonable by the single fact that the person or item in question had entered into our country from outside," *id.* at 619, 6 S.Ct. at 526, " 'because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in,' " *id.* at 618, 6 S.Ct. at 525 (quoting *Carroll v. United States*, 267 U.S. 132, 153–54, 45 S.Ct. 280, 285–86, 69 L.Ed. 543 (1925)). The Court went on to note that suspicionless searches of those entering the country were necessary to the enforcement of the nation's immigration laws, import restrictions, and customs requirements. *Id.* 116 U.S. at 619, 6 S.Ct. at 526.

In our view, these arguments are inapplicable to searches of individuals exiting the country. To begin, there is no historical justification for suspicionless searches of exiting individuals. The first customs statute dealt with the collection of duties on imports. Neither the statute nor its legislative history mentions exports on exit searches. *See* Note, Beyond the Border of Reasonableness: Exports, Imports and the Border Search Exception, 11 Hofstra L.Rev. 733, 763 (1983), and sources cited therein.

More important, in the case of exit searches the balance between the government's need to search and the infringement on privacy interests caused by a search is vastly different.[5] While the government interests implicated by exits are of substantially less importance than the interests implicated by entrances, the intrusiveness of exit searches is significantly greater

---

5. We note that the balancing we conduct here is not the sort of specific weighing of facts required to determine the reasonableness of a particular search but the more general consideration of whether constitutional values and government interests merit the creation of an exception to the usual probable cause requirement.

than the intrusiveness of entrance searches.

First, entrance searches are supported by the government's very substantial interests in preventing narcotics smuggling, enforcing the immigration laws, and collecting customs duties. Exits, on the other hand, implicate only currency reporting requirements, the prohibition on the export of "defense articles or defense services designated by the President," 22 U.S.C. § 2778, and the Export Regulations Act's restrictions on the export of strategic and high technology goods, 50 U.S.C. app. 2401–20. Violations of these restrictions are less frequent and more easily detected than narcotics smuggling, making resort to suspicionless exit searches less compelling.

Second, while entry searches are routinely conducted in this country, exit searches are quite uncommon. Thus, a traveller is likely to be stigmatized when he is singled out for an exit search.

In short, we believe that the reasoning which led the Supreme Court to uphold suspicionless entrance searches in *Ramsey* can not be extended to exit searches and that suspicionless exit searches accordingly violate the fourth amendment. If we were free to act on our conclusions, we would rule that the search of appellant's belongings and person was unconstitutional and would strike down appellant's convictions.

■ We are not free, however, to act on our own conclusions. In both *United States v. Stanley*, 545 F.2d 661 (9th Cir. 1976), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978), and *United States v. Duncan*, 693 F.2d 971 (9th Cir. 1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983), our court held that the border search exception does extend to searches of individuals exiting the country. In *Duncan*, in fact, the court

reached this conclusion on facts that are indistinguishable from those before us today. We are bound—in the absence of en banc consideration—to follow these decisions. Thus, we hold that the search of appellant's person and belongings falls within the border search exception to usual fourth amendment standards and that consequently the fact that the search was conducted without a warrant or probable cause does not render the search unconstitutional.[6]

## B

■ While a border search may be initiated in the absence of both a warrant and probable cause, the officer conducting the search must nonetheless proceed in a reasonable manner. *See United States v. Guadalupe-Garza*, 421 F.2d 876, 878 (9th Cir.1970). Thus, while every person crossing the border may be required to disclose the contents of his or her baggage based on nothing more than the fact that he has crossed the border, more intrusive searches must be supported by some level of suspicion. *Id.; Henderson v. United States*, 390 F.2d 805, 808 (9th Cir.1967).

■ The type and level of suspicion demanded by the reasonableness requirement is "incapable of comprehensive definition .... [I]n each case the need for the particular search is balanced against the invasion that the search entails." *Guadalupe-Garza*, 421 F.2d at 878. Nonetheless, our prior decisions provide us with some general guidelines which facilitate our review. Under these decisions, a simple patdown search is "permissible with only a minimal showing of suspicion," *United States v. Couch*, 688 F.2d 599, 604 (9th Cir.1982) (citations omitted), but a strip search must be based on "real suspicion,"

---

**6.** Appellant also contends that the border search exception is inapplicable here because the search did not take place at the "functional equivalent" of the border. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). In *United States v. Duncan*, 693 F.2d 971, 977 (1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321

(1983), however, we held that it would be "unreasonable" to require that a passenger board a plane before allowing a customs stop. "It is enough that the passenger manifests a definite commitment to leave the United States and that the search occur in reasonable temporal and spatial proximity to the departure." *Id.*

*Guadalupe-Garza,* 421 F.2d at 876, and body cavity searches and X-ray examinations require a "clear indication" that the suspect is carrying contraband in a body cavity, *United States v. Aman,* 624 F.2d 911, 912–13 (9th Cir.1980); *United States v. Ek,* 676 F.2d 379 (9th Cir.1982).

Appellant contends that the search of her person violated these guidelines and thus the reasonableness requirement. We disagree.

The search of appellant's person proceeded in two stages. Initially, the officer conducting the search performed a pat-down examination. Appellant contends that this examination was impermissible in the absence of "real suspicion." She argues that *United States v. Wilmot,* 563 F.2d 1298 (9th Cir.1977), which refused to extend the "real suspicion" requirement to pat-down searches, applies only to cases in which the customs officer is concerned that the individual searched may be carrying a gun.

In so characterizing *Wilmot,* however, appellant overlooks subsequent case law. Since *Wilmot,* we have repeatedly indicated that pat-down searches may be founded on nothing more than "a minimal showing of suspicion." *Couch,* 688 F.2d at 604. *See also United States v. Grayson,* 597 F.2d 1225, 1228 (9th Cir.), *cert. denied,* 444 U.S. 875, 100 S.Ct. 157, 62 L.Ed.2d 102 (1979). Moreover, we have never indicated that a higher standard applies when the officer conducting the search seeks something other than a weapon. Thus, the initial pat-down search was permissible so long as only minimal suspicion was present.

■ This standard was clearly met. The fact that appellant's suitcase contained a number of objects frequently used in narcotics smuggling alone is sufficient to sup-

ply the minimal suspicion necessary to justify the initial pat-down search.[7]

The pat-down search revealed an unexplained bulge under appellant's garments. Consequently, the officer conducting the search extended the search, asking appellant to open her slacks. This action revealed a heavy girdle. The officer then asked appellant to raise her girdle. Appellant complied, revealing the money belt containing $8,000.

Appellant contends that this phase of the search constituted a strip search and consequently was impermissible in the absence of "real suspicion." The government, on the other hand, argues that the search was not a strip search and that "real suspicion" was thus unnecessary.

■ The line between a strip search and less intrusive examinations is a hazy one. *See United States v. Palmer,* 575 F.2d 721, 723 (9th Cir.), *cert. denied,* 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978). This case does not require, however, that we confront this difficult distinction, for we find that in this case there was "real suspicion" sufficient to justify even a strip search.

We have defined "real suspicion" as suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into [or out of] the United States contrary to law.

The objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched; otherwise, the scope of the search is not related to the justification for its initiation, as

---

7. Appellant implies that because this evidence was not discovered until after Agent Hekala announced his intention of performing a pat-down search, it can not be used to justify that search. We have previously stated, however, that a search is constitutional so long as there existed the requisite amount of suspicion at the time the search was performed. *United States v. Bugarin-Casas,* 484 F.2d 853, 854 n. 1 (9th Cir.), *cert. denied,* 414 U.S. 1136, 94 S.Ct. 881, 38

L.Ed.2d 762 (1974). The fact that the suspicion is based on evidence obtained after the intent to search has been formed is relevant only if the government agent elicits this evidence by making known his intent to conduct a search. Such was not the case here. The evidence in the third bag was discovered as a result of a search that Agent Hekala could have legally conducted at any time.

it must be to meet the reasonableness standard of the Fourth Amendment. *Guadalupe-Garza*, 421 F.2d at 879. The government contends that this standard was satisfied by the following facts:

1. While appellant made all flight preparations with her traveling companion, they were listed as flying separately, and when the companion entered the jetway he passed appellant, ignoring her.

2. Objects typically used in narcotics smuggling were found in a suitcase bearing appellant's name.

3. Appellant's travel itinerary was suspicious.

4. The initial pat-down search revealed an unexplained bulky area around her waist.[8]

We believe that these facts are more than sufficient to satisfy the "real suspicion" test. In particular, we are persuaded by the fact that the initial pat-down search revealed an unexplained bulge around appellant's waist. On a number of occasions, we have held that a pat-down search which reveals such a bulge creates "real suspicion" justifying a strip search. *Wilmot*, 563 F.2d at 1300; *United States v. Rivera-Marquez*, 519 F.2d 1227, 1228 (9th Cir.), *cert. denied*, 423 U.S. 949, 96 S.Ct. 369, 46 L.Ed.2d 285 (1975). *See also Palmer*, 575 F.2d at 722–24 (unexplained wearing of girdle justified officer's request that suspect raise girdle during search).

Because we find that "real suspicion" was present we conclude that the more intrusive later stage of the search of appellant's person was permissible whether or not it constituted a strip search. Having already held that the initial pat-down search of appellant was reasonable, we conclude that the search of appellant's person satisfied fourth amendment requirements and that the evidence which it produced was properly admitted.[9]

### III

■ Appellant next challenges her conviction under 18 U.S.C. § 1001 for making a fraudulent statement to a government official. Appellant attacks the conviction on a variety of grounds. We consider only one of her arguments, however, because we find that argument to be dispositive.

Appellant argues that her conviction under 18 U.S.C. § 1001 merges into her conviction under 31 U.S.C. § 1058 pursuant to the statutory interpretation rule of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). We agree. In *United States v. Woodward*, 726 F.2d

---

**8.** The government also relies on the fact that appellant was traveling with an individual who failed to report that he was carrying over $5,000 out of the country. Appellant challenges this reliance on her association with Herbenson. First, citing *United States v. Afanador*, 567 F.2d 1325 (5th Cir.1978), she argues that a search founded on suspicion derived from an association with another is unreasonable. Second, she contends that such a search violates the first amendment's right to association.

Because we find that the other facts relied upon by the government were sufficient to satisfy the "real suspicion" requirement, we need not consider appellant's fourth and first amendment challenges.

**9.** Appellant also complains that when the customs agent caused her to miss her flight by subjecting her to a search, he violated her fifth amendment right to travel. Appellant never indicates what relief she desires for this alleged violation. We presume, however, that she seeks the exclusion of the evidence produced by the search which caused the challenged delay. Exclusion of evidence is not a remedy available under the fifth amendment, however. If appellant truly seeks to vindicate her fifth amendment rights, her only recourse is a civil rights action.

We suspect, however, that appellant's complaint is more properly based upon her fourth amendment right to move without interference or delay. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 879, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975). In this case, however, such an argument would be no more effective than appellant's fifth amendment challenge. We have repeatedly stated that any delay reasonably necessary to conduct a valid border search satisfies fourth amendment standards. *See, e.g., United States v. Ek*, 676 F.2d 379, 381 (9th Cir. 1982); *United States v. Erwin*, 625 F.2d 838, 841 (9th Cir.1980). Appellant does not contend nor does the record indicate that the delay of which she complains exceeded what was reasonably necessary to conduct the search of her belongings and person.

1320 (9th Cir.1983), we decided this very question, holding that under *Blockburger,* a violation of 18 U.S.C. § 1001 is an included offense within a conviction under 31 U.S.C. § 1058. *Id.* at 1326–27. *See also United States v. Booky,* 733 F.2d 1335 (9th Cir.1984). Consequently, we vacate appellant's 18 U.S.C. § 1001 conviction.

### IV

Finally, appellant raises two challenges to her 31 U.S.C. § 1058 conviction. First, she argues that there was insufficient evidence to support her conviction because the government failed to prove that she knowingly and willfully violated the reporting requirement. Second, she argues that the conviction violated her fifth amendment right against self-incrimination.

### A

Appellant contends that the evidence of knowledge and willfulness was deficient on two counts.

Appellant first contends that in order to show willful failure to report, an agent must tender a reporting form and obtain from the traveler a written denial that she is transporting in excess of $5,000 in monetary instruments. Appellant suggests that "[m]any persons, erroneously concluding from the official inquiry, that it is illegal to have more than $5,000 on their person, will *orally* deny its presence, yet reveal its presence on a written form executed under penalty of perjury." Appellant's Opening Brief at 37 (emphasis in original).

Appellant's argument is unpersuasive. Nothing in section 1101 indicates that a written denial is required. Nor does it make sense to impose such a requirement. Since passengers leaving the United States who are not transporting monetary instruments in excess of $5,000 need not file a report at all, it is not unreasonable for a Customs agent to ask whether passengers are transporting in excess of $5,000 before providing a form.

Second, appellant contends that even if a writing is unnecessary to show willfulness, the government produced insufficient evidence to show that she knew of the reporting requirement. To begin, she argues that much of the evidence that was produced merely demonstrates that she erroneously believed that transporting more than $5,000 out of the country was a crime. This mistaken belief, she contends, caused her to mislead Agent Hekala and to violate unwittingly the reporting requirement in an effort to avoid detection. In addition, she argues that most of the circumstantial evidence produced by the government was legally insufficient. Actual knowledge of the reporting requirement can not be inferred, appellant contends, from the fact that her passport contained a written notice of the requirement or that posters concerning the requirement were posted in the departure area.

Again, appellant's arguments fail. A conviction is supported by sufficient evidence so long as "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). We hold that there was evidence sufficient to satisfy this standard even if the evidence challenged by appellant is excluded from consideration. The record clearly indicates that appellant's traveling companion, Mr. Herbenson, was, in her presence, arrested and informed that he was being arrested *for failure to report* the fact that he was transporting in excess of $5,000 out of the country. We believe that a rational trier of fact could, on the basis of this evidence alone, conclude that appellant knowingly violated the reporting requirement.

### B

Finally, appellant challenges her 31 U.S.C. § 1058 conviction on the basis of her fifth amendment right against self-incrimination. The conviction was founded upon

her failure to file a written report indicating that she was transferring monetary instruments of more than $5,000 out of the country and providing information concerning the origin, destination, and ownership of the instruments. *See* 31 U.S.C. § 1101. Appellant argues that the requirement that such a report be filed "was enacted as an investigative tool for law enforcement agencies in order to curb criminal activity associated with the transfer of substantial sums of money," Appellant's Opening Brief at 40, and forces an individual to provide information that "may well become a key piece of evidence in connection with a conspiracy or other crime," *id.* at 41. Thus, she contends, the requirement violates the fifth amendment.

"Whenever [a court] is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one." *California v. Byers*, 402 U.S. 424, 427, 91 S.Ct. 1535, 1537, 29 L.Ed.2d 9 (1971) (plurality opinion). The tension between the government's interest in disclosure and the individual's right against self-incrimination "must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly." *Id.*

In evaluating the individual's claim to constitutional protections, a court must determine whether or not compliance with the challenged requirement creates a "real and appreciable" danger of incrimination. *Marchetti v. United States*, 390 U.S. 39, 48, 88 S.Ct. 697, 702, 19 L.Ed.2d 889 (1968) (quoting *Brown v. Walker*, 161 U.S. 591, 599, 16 S.Ct. 644, 648, 40 L.Ed. 819 (1896)). If the danger is merely "imaginary and unsubstantial," the fifth amendment offers no protection. *Id. See also Byers*, 402 U.S. at 429, 91 S.Ct. at 1538 ("In order to invoke the privilege it is necessary to show that the compelled disclosures will themselves confront the claimant with 'substantial hazards of self-incrimination.' "); *Leary v. United States*, 395 U.S. 6, 13, 89 S.Ct. 1532, 1536, 23 L.Ed.2d 57 (1969).

We evaluate the danger of incrimination by looking to a number of factors. First, does the reporting requirement involve an area "permeated with criminal statutes," *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 79, 86 S.Ct. 194, 199, 15 L.Ed.2d 165 (1965), or one that is primarily regulatory, *see Byers*, 402 U.S. at 430, 91 S.Ct. at 1539. Second, is the requirement aimed at "a highly selective group inherently suspect of criminal activities," *Albertson*, 382 U.S. at 79, 86 S.Ct. at 199, or at the public generally, *see Byers*, 402 U.S. at 430–31, 91 S.Ct. at 1539. Finally, would compliance with the requirement force an individual to provide information that "would surely prove a significant 'link in a chain' of evidence tending to establish his guilt." *Marchetti v. United States*, 390 U.S. 39, 48, 88 S.Ct. 697, 703, 19 L.Ed.2d 889 (1968).

Applying these criteria to this case, we conclude that the reporting requirement challenged by appellant does not create the "substantial hazards of self-incrimination" prohibited by the fifth amendment. To begin, while the reporting requirement is not directed at an area which is exclusively regulatory, it certainly does not involve a field "permeated with criminal statutes." It is not a crime to transfer more than $5,000 in monetary instruments out of the country; nor is such activity invariably or even usually connected with illegality. In contrast, in every case in which the Supreme Court has held a reporting requirement invalid, the statute in question has required information concerning activities which are almost always illegal. *Marchetti* involved a statute requiring that individuals register prior to engaging in the business of accepting wagers— an activity illegal in virtually every state. *Albertson* concerned a provision of the Subversive Activities Control Act of 1950 requiring that members of the Communist Party officially register. Membership in the Communist Party was a crime under both the Subversive Activities Control Act and the Smith Act.

By the same token, the reporting requirement in question is not aimed at a "highly selective group inherently suspect of criminal activities." It is true that the transport of large sums of money is sometimes connected with illegal activity, and Congress did enact the reporting requirement in part because it believed that it would yield information useful in criminal investigations. *See* H.R.Rep. No. 975, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Admin. News at 4394, 4405. The requirement is directed, however, at all persons travelling across the border with more than $5,000 in monetary instruments. Since the transportation of monetary instruments in such amounts is not itself illegal and since there is no reason to suppose that the transportation of monetary instruments in such amounts is generally connected with criminal activity, the vast majority of people subject to the requirement are not suspect of illegality. This is in sharp contrast to the groups subject to every reporting requirement struck down by the Supreme Court. The statutes involved in these cases almost necessarily pertained to individuals involved in criminal activities. *See, e.g., Leary,* 395 U.S. at 6, 89 S.Ct. at 1532 (individuals trafficing in marihuana); *Marchetti,* 390 U.S. at 39, 88 S.Ct. at 697 (individuals accepting wagers); *Albertson,* 382 U.S. at 79, 86 S.Ct. at 199 (members of the Communist Party).

Finally, the information which an individual must provide under the reporting requirements generally will not "prove a significant 'link in a chain' of evidence tending to establish guilt." Since the requirement concerns such relatively innocuous matters as the legal capacity in which the person filing the report is acting; the origin, destination, and route; and the amount and kind of monetary instruments transported, any information obtained would be at best tangentially related to criminal activity. Again, this contrasts sharply with the information yielded by statutes the Supreme Court has found unconstitutional. In *Marchetti,* for instance, the statute in question required that individuals engaged in wagering pay an occupational tax and post revenue stamps denoting the payment of this tax. In a number of States and municipalities the very possession of these revenue stamps was illegal. *Marchetti,* 390 U.S. at 48–49 n. 10, 88 S.Ct. at 702–703 n. 10.

Having concluded that the reporting requirement challenged by appellant does not create the "substantial hazards of self-incrimination" prohibited by the fifth amendment, we need not go on to consider the other side of the balancing test—the public need for disclosure. We note, however, this reporting requirement is supported by significant, non-investigative governmental interests. In enacting the requirement, Congress noted that it was intended "to facilitate the supervision of financial institutions properly subject to Federal supervision" and "to provide for the collection of statistics necessary for the formulation of monetary and economic policy." H.R.Rep. No. 975, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Admin.News at 4394, 4405. Neither of these interests is insubstantial.

In sum, the considerations weighing in favor of the constitutionality of the reporting requirement imposed by the Bank Secrecy Act are overwhelming. Thus, we join the only other circuit which has considered this question—the Second Circuit—in holding that the requirements do not run afoul of the fifth amendment right against self-incrimination. *United States v. Dichne,* 612 F.2d 632 (2d Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980).

## V

In conclusion, we uphold the search of appellant's belongings and person and affirm her conviction under 31 U.S.C. § 1058. We reverse, however, appellant's conviction under 18 U.S.C. § 1001. Consequently, we vacate appellant's entire sentence and remand for reconsideration of the proper sentence to be imposed. *See United States v. Woodward,* 726 F.2d 1320, 1328 (9th Cir. 1983).

AFFIRMED in part, REVERSED in part, and REMANDED.