**UNITED STATES of America,**
**Plaintiff,**

v.

**Celia ROMERO, Defendant.**

**No. CR 99–0048 CRB.**

United States District Court,
N.D. California.

June 16, 1999.

Geoffrey A. Anderson, U.S. Department of Justice, Organized Crime Strike Force, San Francisco, CA, for plaintiff.

Larry B. Kupers, Federal Public Defender's Office, San Francisco, CA, for defendant.

## ORDER

BREYER, District Judge.

Now before the Court is defendant Celia Romero's motion to suppress certain evidence obtained as a result of a pat-down search of her person conducted by a United States Customs inspector at the San Francisco International Airport. For the reasons set forth below, defendant's motion is granted.

### BACKGROUND

On the morning of January 13, 1999, Celia Romero prepared to board a flight to Guadalajara, Mexico. She was traveling alone and did not possess any carry-on baggage beyond a purse. While Ms. Romero was waiting in line in the jetway, she was selected at random by Customs Inspector Patricia Hartney for questioning. Inspector Hartney approached Ms. Romero and informed her that federal law required international travelers to report to the government if they are carrying more than $10,000. Ms. Romero indicated that she was only carrying $4000. The inspector then asked the defendant to move to another area of the jetway, and showed her a Spanish language copy of Customs Publications Form 503. Ms. Romero indicated to the agent that she

couldn't "read this translation," so the agent provided her with an English version of the document. Inspector Hartney then asked the defendant to indicate on the form the amount of money she was carrying. Ms. Romero complied with this request, writing "$4000" and signing the document.

The customs inspector then asked Ms. Romero to accompany her and another agent down a stairwell to a more private area where she could verify her currency. When they arrived at the bottom of the stairwell, the defendant reached into the center of her waistband area and withdrew $3000 in currency, composed of twenty $50 bills and twenty $100 bills.

Inspector Hartney testified that after the defendant produced the $3000, she asked Ms. Romero, "Is that all you have?" Although the parties essentially agree on the events that took place until this point, they sharply dispute what happened next. Inspector Hartney testified that Ms. Romero responded to her question ("Is that all you have?") by saying "yes." Ms. Romero, on the other hand, submits by way of declaration that she told the inspector that an additional $1000 was contained in her purse.[1] In any event, after this brief exchange, the content of which is in dispute, Inspector Hartney immediately conducted a pat-down search of the defendant. At the same time, the other agent who was present searched the defendant's purse. The pat-down search revealed that defendant was concealing $55,000 in money orders in a girdle in her hip areas. The search of the purse revealed an envelope containing $1000 cash, and a wallet containing an additional $399 in cash. At this

---

**1.** Ms. Romero also declared that she had informed the agent of this fact earlier, in the jetway. Specifically, she declared as follows: The inspector asked me several questions. She wanted to know how much money I was carrying. She asked me if I was carrying money for anyone else. I told her that I was, that I was carrying $1000 that belonged to a friend. I was going to delivery [sic] that money to my friend's mother who

lives in Mexico. I told the inspector that I had this money in my purse. . . . They took me to a third location, a hallway away from the boarding area. One of the inspectors had taken my purse and was holding it when we arrived at this area. One inspector asked me to show her the money I had. I took $3000 in cash from underneath the waistband of my underclothes and told her the other money was in my purse.

juncture, the customs inspectors determined that they had probable cause to believe that the defendant was in violation of 31 U.S.C. § 5316, which requires the reporting of exportation of monetary instruments over $10,000.

Defendant now moves to suppress all evidence of this offense obtained by the government following the pat-down search by inspector Hartney, on the grounds that the search violated her Fourth Amendment right to be free from unreasonable searches and seizures.

## LEGAL STANDARD

■ The Ninth Circuit has repeatedly held that border searches occupy a unique position in Fourth Amendment jurisprudence. *See, e.g., People of the Territory of Guam v. Sugiyama,* 846 F.2d 570, 571 (9th Cir.1988), *United States v. Des Jardins,* 747 F.2d 499, 502 (9th Cir.1984), vacated in part, 772 F.2d 578 (9th Cir.1985). Indeed, certain border searches "may be initiated without a warrant, probable cause, or even articulable suspicion." *Des Jardins,* 747 F.2d at 502.

■ However, to comply with the requirements of the Fourth Amendment, "the officer conducting the search must nonetheless proceed in a reasonable manner." *Id.* at 504. Thus, "while every person crossing the border may be required to disclose the contents of his or her baggage based on nothing more than the fact that he has crossed the border, more intrusive searches must be supported by some level of suspicion." *Id.* In the case of a pat-down search, only a "minimal showing of suspicion" is required. In comparison, a more invasive strip search must be based on "real suspicion." *Id.*[2] In any event, "the type and level of suspicion demanded by the reasonableness require-

ment is incapable of comprehensive definition.... In each case the need for the particular search is balanced against the invasion that the search entails." *Id.*

■ Accordingly, the government must demonstrate that under the facts and circumstances of this case, Inspector Hartney's search was reasonable. More specifically, the controlling question is whether the pat-down search of Ms. Romero was justified by some minimal level of suspicion.

## DISCUSSION

The government argues that a number of factors coalesced to create a sufficient level of suspicion to justify the pat-down search of Ms. Romero. It first points out that Ms. Romero was traveling alone to Mexico, a country known to be a major source of drug traffic and money laundering. Second, it points to the fact that the agent had discovered that Ms. Romero was concealing $3000 cash in her waistband. Finally, the government emphasizes the discrepancy between the amount of cash that Ms. Romero initially declared ($4000), and the amount that she produced from her waistband when the agent sought verification ($3000). This discrepancy was, in fact, the *sole* reason provided by Inspector Hartney during her testimony at the suppression hearing to justify her pat-down search of the defendant.[3]

As a preliminary matter, the Court must resolve a factual dispute between the government and the defendant. As mentioned above, Ms. Romero claims that when Inspector Hartney asked her if the $3000 she had produced from her waistband was all she had, she responded that the additional $1000 was contained in her purse. Inspector Hartney, on the other hand, when asked by defense counsel

2. Regretfully, this standard does not lend itself to straightforward application. For example, does the fact that "minimal suspicion" constitutes a lower standard than "real suspicion" imply that "minimal" suspicion need not be "real"? Is it required that "minimal" suspicion be "articulable," or may it be so minimal as to be *inarticulable?*

3. Indeed, on direct examination, the government neglected to elicit *any* explanation from the inspector regarding the source of her suspicion. It was only upon cross-examination by defense counsel that the inspector provided this justification for the search.

about Ms. Romero's alleged response, stated, "I didn't hear her say that." Later in cross-examination, Inspector Hartney provided a slightly different description of the conversation, stating that the defendant affirmatively denied having any money beyond the $3000 she had produced.

Based on the facts and circumstances of the case and the nature of the testimony provided during the suppression hearing, the Court finds the recollections expressed by Inspector Hartney to be unreliable. The defendant knew that she had written $4000 on the Customs form—at the request of the inspector. It is also highly probable that she knew she was carrying approximately $4000 in cash, given that she was, in fact, carrying that amount. Further, she likely knew that once she produced $3000 from her waistband, the discrepancy between the amount reported and the amount produced would elicit further inquiry. And, as Inspector Hartney herself testified, the defendant remained calm and cooperative during this period—she did not appear nervous or flustered. In light of the foregoing, it is improbable that the defendant told the agent that she did not have any more money, thereby giving rise to a discrepancy that may have aroused suspicion in the Customs agents.

Perhaps the government could have bolstered the testimony of Inspector Hartney by calling the defendant to the witness stand to cross-examine her on her declaration testimony. Indeed, given that the defendant's version of her conversation with the Customs inspector was so strongly corroborated by the fact that an additional $1000 was discovered in her purse, it seems that some cross-examination would have been helpful to the government's case. However, notwithstanding the fact that it was offered this opportunity both by defense counsel and by the Court, the government declined to cross-examine Ms.

Romero. The Court is thus left with the recollection of the Customs inspector, the declaration testimony of the defendant, and the facts and circumstances of the case which corroborate defendant's version of the conversation. Accordingly, the Court finds that the defendant informed the inspectors that her purse contained an additional $1000. Had the inspectors searched the defendant's purse before conducting the pat-down search, they would have learned that the apparent discrepancy between the amount reported by Ms. Romero and the amount she was carrying did not exist. The discrepancy may not, therefore, be considered as one of the factors that created the requisite suspicion to conduct a pat-down search.[4]

This factual dispute having been resolved in favor of the defendant, the Court must consider whether the remaining factors articulated by the Assistant United States Attorney coalesce to create the requisite level of suspicion. Again, the government argues that the fact that the defendant was traveling alone to a country known for drug trafficking and money laundering, combined with the fact that she was concealing $3000 cash in her waistband, is sufficient to create the minimal level of suspicion necessary to conduct a pat-down search. This argument fails for a number of reasons.

First, the government can point to no case in which a court has held that the "minimal suspicion" standard was met under such sparse circumstances. Indeed, the case law of this circuit strongly suggests that more is required. For example, in *United States v. Vance,* 62 F.3d 1152, 1156 (9th Cir.1995), the court found the necessary level of suspicion for an airport pat-down when an examination of defendant's airplane ticket revealed that he had been in Hawaii for less than 24 hours, defendant told the agents he had been

---

4. The Court expresses no opinion at this juncture whether the existence of such a discrepancy is sufficiently suspicious to justify a pat-down search. It is worth noting, however, that the amount the defendant wrote on the Customs form was *more* than the amount she produced, and that both amounts were substantially less than the $10,000 threshold that triggers the reporting requirement. A discrepancy of this nature may be equally consistent with the commission of an innocent mistake as it is with guilty conduct.

there for three days, and defendant appeared glassy-eyed, disoriented, and under the influence of drugs. In *People of the Territory of Guam v. Sugiyama*, 846 F.2d 570, 572 (9th Cir.1988), the agents properly conducted a pat-down when they knew that the suspect was connected to packages of marijuana that had previously been sent to the airport. In *United States v. Des Jardins*, 747 F.2d 499, 505 (9th Cir. 1984) (vacated in part, 772 F.2d 578 (9th Cir.1985)), the court held that an airport pat-down search was justified by minimal suspicion in light of the fact that agents had discovered a number of objects frequently used in narcotics smuggling in the defendant's suitcase. In *United States v. Quintero–Castro*, 705 F.2d 1099, 1100–01 (9th Cir.1983), a pat-down search was appropriate where the defendant appeared nervous; he had paid cash for his airline ticket; he said that he was on a short pleasure trip without his family; although he had relatives in the area, he planned to stay at a hotel; he and a co-suspect provided conflicting stories about whether they knew each other; he was carrying a large amount of cash; and he told conflicting stories about his occupation. In *United States v. Carter*, 563 F.2d 1360, 1361 (9th Cir.1977), the court upheld a pat-down search at the airport when the defendant appeared nervous and "gave evasive answers concerning his occupation and the purpose of his overseas trip." In *United States v. Rivera–Marquez*, 519 F.2d 1227, 1228 (9th Cir.1975), the court upheld a pat-down search on the border when an informer told agents that a man with defendant's name would be smuggling drugs across the border on that day.

The circumstances existing in these and other cases applying the "minimal suspicion" standard are absent here. For example, in contrast to the typical case in which an agent had minimal or reasonable suspicion to conduct a limited search or seizure, Inspector Hartney and another agent testified here that Ms. Romero remained calm and cooperative and did not appear flustered, nervous or suspicious. Further, the inspector was not aware of the duration of the defendant's trip to Mexico. Nor did she know whether the defendant had checked any baggage before boarding the plane or whether she had paid cash for her ticket.[5] The inspector simply knew that Ms. Romero was traveling by herself to Mexico, and that she was concealing $3000 cash on her person. These factors are insufficient to create minimal suspicion.

The fact that the defendant—who clearly appears to be Hispanic—was traveling to Mexico by herself is not suspicious. The fact that she concealed cash on her person is equally consistent with innocence as it is with guilt; travelers commonly conceal cash in their clothes to minimize the risk of being robbed, particularly when they are traveling to a country such as Mexico.[6] If these circumstances, on their own, were sufficient to create minimal suspicion, a "very large category of presumably innocent travelers" would be subject to pat-down searches at the airport. *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Morgan v. Woessner*, 997 F.2d 1244, 1254 (9th Cir. 1993).[7]

---

5. As such, this case is similar to the unlawful airport search of ex-professional baseball player Joe Morgan, where there was "no claim that Morgan was dressed in an unusual manner, that he was hurrying through the airport, that he was carrying anything unusual, that he seemed nervous, or that any other factors normally relied upon in justifying investigatory stops at airports existed." *Morgan v. Woessner*, 997 F.2d 1244, 1254 (9th Cir.1993).

6. It is significant that the government elicited no testimony from the inspector, or from anyone else, to rebut this notion.

7. At oral argument, the government attempted to compare the agent's discovery of the $3000 with the discovery of the drug paraphernalia in the suitcase of the suspect in *Des Jardins*. This comparison is barely worthy of response. The possession of drug paraphernalia is evidence that the suspect is engaging in guilty conduct; the possession of money is evidence that the suspect possesses money.

The inspector's failure to resort to less intrusive investigatory methods before conducting the pat-down search serves to confirm the Court's conclusion that the government has failed to satisfy the reasonableness requirement of the Fourth Amendment. For example, the inspector could have done what the agents in many of the above-cited cases did—namely, question the defendant about the details of her trip in an effort to discover anything suspicious. Moreover, had the inspector simply checked Ms. Romero's airline ticket, she would have discovered that the defendant was scheduled to return the next day. Had the inspector sought to determine whether the defendant checked any luggage before boarding the plane, she would have discovered that she did not. These factors, in combination with the fact that defendant was traveling alone to Mexico and was merely carrying a purse, may very well have given rise to a minimal level of suspicion sufficient to justify a pat-down search.[8] However, the inspector failed to utilize these seemingly standard investigatory techniques, instead invading the privacy of the defendant without first developing the requisite level of suspicion.

## CONCLUSION

There is no doubt that the courts must grant government agents due deference when reviewing their conduct. Nor is it necessary that agents always invoke the least intrusive means possible in their efforts to detect criminal activity. In this case, however, the government has crossed the line, conducting a search based on a justification so scant as to sweep countless presumably innocent citizens into its fold. Accordingly, all evidence obtained by the government following the pat-down search of the defendant is hereby suppressed.

**IT IS SO ORDERED.**

---

8. Conversely, in the case of an innocent traveler, resort to these less intrusive techniques may have absolved the individual of any suspicion, thereby protecting them from the invasion of privacy attendant with a pat-down search.