UNITED STATES of America,
Appellant,

v.

Jose GUADALUPE–GARZA, Appellee.

No. 23821.

United States Court of Appeals,
Ninth Circuit.

Feb. 2, 1970.

---

William J. Zumwalt (argued), San Diego, Cal., for appellant.

Shelby R. Gott (argued), Joseph A. Milchen, Asst. U. S. Attys., Edwin L. Miller, U. S. Atty., San Diego, Cal., for appellee.

Before ELY and HUFSTEDLER, Circuit Judges, and THOMPSON,* District Judge.

* Hon. Bruce R. Thompson, United States District Court Judge, Reno, Nevada, sitting by designation.

HUFSTEDLER, Circuit Judge:

Appellant appeals from a judgment convicting him for a violation of 21 U. S.C. § 174 (smuggling heroin) and a violation of 18 U.S.C. § 111 (assaulting a federal officer). A five-year sentence was imposed on the first count, and a three-year sentence on the second, the sentences to run concurrently. A third count, charging him with a violation of 18 U.S.C. § 1407 (failure to register as a narcotics addict), was dismissed, after the District Court found him not guilty.

Appellant does not attack his conviction for violation of 18 U.S.C. § 111. We reverse the conviction for smuggling heroin for error in denying appellant's motion to suppress the admission of the heroin that was the product of an illegal search.

After 4 o'clock in the afternoon of September 2, 1968, appellant entered the United States from Mexico at Calexico, California. In response to Customs Inspector Jones' inquiries, appellant said he was an American citizen and that he was not bringing any merchandise into the United States from Mexico. Jones noticed nothing untoward about appellant and sent him on. Customs Inspector Baker, stationed at a secondary inspection point, observed appellant passing through the pedestrian inspection line. When he came within five feet of Inspector Baker, appellant tilted his head to one side and shied away from Baker. At Baker's request, appellant went into the customs office. Baker then asked appellant a few routine questions, and observed that appellant appeared nervous. Appellant told Baker that he had not brought anything from Mexico.

Baker thereupon directed appellant to disrobe, and he conducted a strip search of appellant. No contraband was discovered during the search, but Baker noticed that appellant's "stomach was beating fast"[1] and he was "sweating extensively." The outside temperature was hot; the air-conditioned customs office was cooler. Baker also observed hypodermic needle marks on appellant's arm. There was no evidence that Baker saw any needle marks on appellant before he ordered the strip search. Baker called Customs Agent Goff to look at appellant. Goff observed some old, healed tracks on appellant's arms and some marks that appeared to be only three to four days old. Prior to giving appellant any advice about his constitutional rights, Goff interrogated appellant about the marks. Appellant responded that they were "scratches." At about 5 o'clock, Customs Agent Riggs joined Goff in interrogating appellant. Without any constitutional warnings, Riggs asked appellant how long he had been using narcotics. Appellant denied that he had been using narcotics.

Goff decided to take appellant to Imperial County Hospital "to secure a medical opinion as to the nature of the marks on defendant's arms. * * *" The District Court found: "The decision by Agent Goff to take defendant to the Imperial County Hospital for a medical examination of the marks on his arms was predicated on the following factors: (1) Baker's relation to Goff of the extremely nervous demeanor of the defendant, his physical condition (including the marks on defendant's left arm and the palpitations of his stomach), and the lack of discovery of any contraband during the personal search, (2) Goff's personal observation of the marks on defendant's left arm, which appeared to him to be marks left by injections of hypodermic needles, (3) defendant's nervous demeanor in the presence of Goff, (4) the unsatisfactory response of defendant to the questions relating to the nature of the marks on defendant's arms, his prior usage of narcotics, and his place of residence, (5) the hesitant and evasive manner in which defendant responded to those questions, and (6) Goff's experience that persons travel great distances to secure more readily

---

1. All quotations are from the findings of the District Court unless otherwise expressly noted.

available and cheaper narcotics in Mexico."

At about 6 o'clock p. m., appellant was taken to the emergency room of the hospital. Dr. Aurbach, a licensed physician, visually inspected appellant. He identified the marks on appellant's arm and some old tracks on his left ankle as having been made by hypodermic needles. Upon Goff's direction, Dr. Aurbach probed appellant's rectal tract The result was negative. At 6:30 p. m. Dr. Aurbach ordered a vocational nurse to inject an emetic into appellant's hip to induce vomiting. Appellant "regurgitated an insufficiently small amount."

Between 6:30 and 7:00 p. m. appellant "grabbed a hospital tray, and attempted to strike Agent Goff." Goff deflected the blow. Appellant then kicked Goff on the left shin. Goff then arrested appellant for assaulting a federal officer and, for the first time, advised appellant of his constitutional rights.

At Goff's direction oral emetics were administered to appellant "two or three times." Appellant was handcuffed when he was caused to drink the emetics. About 8 o'clock p. m. appellant disgorged the contents of his stomach, including two balloons together containing almost 5 grams of heroin.

We turn to appellant's attack upon the constitutional validity of the searches of his person.

The constitutional safeguards found in the Fourth Amendment extend to persons crossing our borders as well as to persons crossing our streets. "[T]he Fourth Amendment protects people, not places." (Terry v. Ohio (1968) 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, quoting Katz v. United States (1967) 389 U.S. 347, 351, 88 S.Ct. 507, 19 L. Ed.2d 576.) In either context, official action must meet the standard of reasonableness. The scope of the particular intrusion, the manner of its conduct, and the justification for initiating it must all be considered. The test of reasonableness is incapable of comprehensive definition or of mechanical application; in each case the need for the particular search is balanced against the invasion that the search entails. (E. g., Terry v. Ohio, supra, 392 U.S. at 18 n. 15, 88 S. Ct. 1868; Sibron v. New York (1968) 392 U.S. 40, 59, 88 S.Ct. 1912, 20 L.Ed. 2d 917; Schmerber v. California (1966) 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908; see also Camara v. Municipal Court (1967) 387 U.S. 523, 536–537, 87 S.Ct. 1727, 18 L.Ed.2d 930.)

Among the circumstances to be considered is the place of the search, because the situs of the search can affect both the need for the search and the severity of the invasion. Was that site the home, the street, the telephone booth, or the border? In each place a person has some "reasonable 'expectation of privacy'" (Terry v. Ohio, supra, 392 U.S. at 9, 88 S.Ct. 1868, quoting Katz v. United States, supra, 389 U.S. at 361, 88 S.Ct. 507 (Mr. Justice Harlan, concurring)), but in each his expectation differs.

Neither history nor contemporary concepts of dignity suggests to anyone that he will be free from official scrutiny on crossing an international boundary. He must anticipate that he will be detained temporarily at the border. He will be interrogated. His vehicle, if any, and his personal effects will be examined. Such routine detention has never been equated with an arrest, however that term is defined in other contexts, and such routine inspections are not deemed unreasonable searches. (E. g., Carroll v. United States (1925) 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543; Boyd v. United States (1886) 116 U.S. 616, 623–624, 6 S.Ct. 524, 29 L.Ed. 746.) But nothing leads a person to anticipate that, on reaching our border, he will be singled out, removed to a private examination room, undressed, and subjected to a skin search. No one should be subjected to the indignity of such a search unless there are compelling reasons to do so.

We realize that there is a strong public interest in preventing smuggling,

particularly in stopping the illegal importation of narcotics. And we know that border surveillance is essential to achieve that end. Were we to hold that strip searches are unreasonable in all circumstances, we would severely impede the enforcement of the customs laws, and we would exacerbate the existing problems in controlling illicit drug traffic. On the other hand, were we to hold that all strip searches are impervious to Fourth Amendment attack, if the searches are conducted by customs officials at the border, we would sanction serious invasions of the privacy of countless innocent travelers whose interests the Fourth Amendment was intended to protect.[2] We reject both extremes.

In Henderson v. United States (9th Cir. 1967) 390 F.2d 805, 808, we recognized that, even though probable cause is not required to initiate a border search, "mere suspicion" would not justify initiating a strip search. The customs official must have "at least a real suspicion, directed specifically to that person," to sustain such a search. But neither *Henderson* nor our decisions following it have further defined the "real suspicion" test stated there. We do so now.

"Real suspicion" justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law.

The objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched; otherwise, the scope of the search is not related to the justification for its initia-

tion, as it must be to meet the reasonableness standard of the Fourth Amendment. (*Cf.* Terry v. Ohio, *supra*, 392 U.S. at 29, 88 S.Ct. 1868; Warden v. Hayden (1967) 387 U.S. 294, 310, 87 S. Ct. 1642, 18 L.Ed.2d 782 (Mr. Justice Fortas, concurring).)

Simple good faith on the part of a customs official in entertaining subjective suspicion unsupported by objective facts does not convert "mere suspicion" into real suspicion. "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate * * *." (Beck v. Ohio (1964) 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142.)

The objective facts articulated by Inspector Baker to justify his initiating and conducting the strip search were these: When appellant was about five feet from Baker in the pedestrian lane, appellant "tilted his head" and "shied away." Appellant appeared nervous when Baker asked him the routine questions. Appellant answered negatively when Baker asked him if he were bringing anything from Mexico. There was no evidence that appellant appeared to be under the influence of drugs when he attempted to cross the border. Customs officials had no information about him from anyone before he was searched. Observation of appellant's arms showing marks and appellant's evasive answers were not made and elicited until after appellant had been stripped.[3]

We conclude that the objective facts did not warrant a real suspicion that appellant was concealing something on his person. Inspector Baker had a hunch about appellant based on appellant's skittish demeanor as he was passing through customs. The fact that four hours, a rectal probe, and several emetics later Inspector Baker's hunch was confirmed does not change a hunch

2. The District Court found from the evidence produced at this trial that between February and September 1968, customs officials at Calexico conducted 331 strip searches of which only 96 led to the recovery of contraband.

3. *Compare* United States v. Castle (9th Cir. 1969) 409 F.2d 1347 *with* Morales v. United States (9th Cir. 1969) 406 F.2d 1298.

into the real suspicion required to sustain a strip search.[4] "[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." (United States v. Di Re (1948) 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210.)

Accordingly, we hold that the heroin recovered from appellant was the product of an illegal search, and the refusal to grant appellant's motion to suppress it was error. It is therefore unnecessary for us to decide whether the body cavity search would have been legal if the strip search had been properly initiated or to decide whether there was error in admitting appellant's statements obtained without a *Miranda* warning after he had been stripped.

Appellant's conviction upon Count One charging him with violating 21 U.S.C. § 174 is reversed, with directions to dismiss that count; the judgment is otherwise affirmed.

4. The fact that Calexico customs officials' suspicions turned out wrong more than two out of every three times that strip searches were ordered is itself an indication that customs officials' subjective suspicions are not inherently reliable. *See* note 2 *supra*.