**James GARCIA and Evaristo Vazquez, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 94–6615.

United States District Court,
E.D. Pennsylvania,

Jan. 31, 1996.

**908**

David Rudovsky, and Stefan Presser, Philadelphia, PA, for plaintiffs.

Virginia Gibson–Mason, Asst. U.S. Atty., Philadelphia, PA, for government.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

This opinion and order follow a hearing on September 28, 1995 pursuant to F.R.C.P. 43(e) to resolve the issues of jurisdiction as set forth in our prior opinion of August 18, 1995 in this matter. *Garcia v. U.S.*, 1995 WL 493251 (E.D.Pa.). In that opinion, we determined that disputed issues of fact existed and that the proper vehicle for raising subject matter jurisdiction was a motion to dismiss under F.R.C.P. 12(b)(1). *Garcia v. U.S.*, 1995 WL 493251 (E.D.Pa.), n. 1.

Plaintiffs James Garcia and Evaristo Vazquez have brought claims before us under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (FTCA) for circumstances surrounding their detention by customs officers at Newark International Airport on February 3, 1994. *Id.* at *1. Plaintiffs contend that this court continues to have jurisdiction pursuant to 28 U.S.C. § 1331 and § 1346(b). We previously noted that the Defendant United ·States' position is that jurisdiction is lacking because Plaintiffs' claim is barred by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). Although we agreed that the customs officers possessed the statutory and regulatory authority to stop passengers under 19 U.S.C. § 1582 and 19 C.F.R. § 162.7, we believed it necessary to allow Plaintiffs an opportunity to prove that the customs inspectors' detention and search of Plaintiffs was unconstitutional and therefore not protected by the discretionary function exception. *Id.* at *4. While we agreed that the United States had not waived its immunity with respect to constitutional tort claims under the FTCA, we nonetheless concluded that the FTCA "clearly does waive that sovereign immunity for claims based on state law." *Id.* at *5. Plaintiffs base their substantive claims under the common tort law of New Jersey.[1]

In our previous opinion, we also declined to rule at that time as a matter of law that the customs inspectors' conduct was indeed based upon "reasonable suspicion." In light of our reading of *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), a case we find seminal if not controlling to the issues raised by this case, we stated:

> [I]n holding that the detention of a suspected alimentary canal smuggler at the border, beyond the scope of a routine customs search and inspection, must be supported by "reasonable suspicion", the *Montoya* court specifically left open the question of what level of suspicion would justify the types of searches at issue here. "We suggest no view on what level, if any, is required for nonroutine border searches such as strip, body-cavity or involuntary x-ray searches." ·

*Garcia v. U.S.*, 1995 WL 493251 at *5 (quoting *Montoya*, n. 4, 473 U.S. 531 at 541, n. 4, 105 S.Ct. 3304 at 3310).

Because we could not, based upon the record before us, preclude the possibility that the inspector's conduct was unconstitutional, we denied the government's motion to dismiss. After a detailed analysis of the two-pronged discretionary function inquiry, we held that, "provided the conduct of customs inspectors was within constitutional bounds, both prongs of the discretionary function are satisfied." *Id.* at *7.

---

1. *See e.g., Bartolo v. Boardwalk Regency Hotel Casino, Inc.*, 449 A.2d 1339, 185 N.J.Super. 534 (1982) (tort of false imprisonment is established upon showing any unlawful restraint upon a man's freedom of locomotion).

■ Because we view the claims alleged in this suit of such a serious nature, and because we find only limited guidance in the case law of this circuit, we have extensively outlined the facts of this case and thoroughly reviewed federal case law pertaining to issues raised herein. As we have previously noted, unlike motions under 12(b)(6), when considering a 12(b)(1) motion, the court is free to determine disputed issues of fact. *Mortensen v. First Federal Sav. and Loan Ass'n,* 549 F.2d 884 (3d Cir.1977); *Martinez v. United States Post Office,* 875 F.Supp. 1067, 1071 (D.N.J.1995).[2] From the one-day non-jury hearing under F.R.C.P. 43(e) on September 28, 1995, we make the following findings of fact.

## II. FINDINGS OF FACT

1. James Garcia and Evaristo Vazquez are American citizens of Hispanic descent, both approximately 26 years old, and residing in Bethlehem and Allentown respectively. The two have been good friends for several years. In the latter part of 1993, Mr. Garcia and Mr. Vazquez decided to take a vacation to Jamaica, where Mr. Garcia had been before. On January 17, 1994, Mr. Garcia went to Liz Cruises & Travels, in Bethlehem, Pennsylvania, to purchase their tickets. (Transcript (hereinafter "T.") at 13–14, 50–51)

2. An employee at Liz Cruises purchased a package vacation that included transportation and lodging for Mr. Garcia and Mr. Vazquez from Friendly Holidays, a major wholesale firm whose size allowed it to secure the lowest prices. The Friendly Holidays corporate office is located in the state of New York. Approximately 95% of all Liz Cruises and Travels' clients are accommodated through such packages, a number that is typical of the industry. (T. at 7, 13)

3. It is not uncommon for an American traveler to travel with tickets originating outside his or her state of residence. Liz Cruises invoiced Plaintiff Garcia on January 18, 1994 for $2594.00 plus a late booking fee of $25.00, for the two package tours. The tickets showed a New York origin as a result of Liz Cruises use of Friendly Holidays' New

York office. The customs inspectors involved in the detention and search of plaintiffs had no training regarding the practice of travel agencies in purchasing tickets at locations outside a passenger's state of residence. (Plaintiffs' Exhibit 8)

4. On January 27, 1994, Mr. Vazquez and Mr. Garcia were driven to Newark by another friend with whom arrangements were made to return them to Bethlehem upon their return on February 3, 1994. Mr. Garcia and Mr. Vazquez spent the next seven nights on vacation at the Jamaica Grand in Montigo Bay. On February 3, 1994, they returned to the United States aboard Continental Airlines flight 442. (T. at 16, 38–39)

5. Both plaintiffs had eaten breakfast in Jamaica and slept on the plane. Upon arriving at Newark International Airport, each man recovered a single checked bag. The plaintiffs testified they were together at the time when they were approached by customs officers. (T. at 17, 37, 52)

6. It is the mission of the United States Customs Service at Newark International Airport to facilitate passengers arriving from international flights, to protect the revenue of the United States, to enforce its laws and to interdict contraband from entering the country. In response to increasingly frequent cases of internal drug smuggling, the United States Customs Service at Newark has instituted procedures to determine if an entrant into the country is carrying drugs in the body's digestive tract. These procedures provide that if, after conducting a thorough baggage examination and personal search with negative results, an Inspector continues to have reasonable suspicion to believe a passenger has secreted narcotics internally (by swallowing balloons or condoms filled with narcotics), he is to request supervisory approval for an x-ray examination. (T. at 246, 257. Government Exhibit 3, Paragraph A)

7. The Inspector requesting x-ray authorization must provide the Supervisor with the articulable facts which aroused his suspicion and precipitated the x-ray request. The pro-

---

**2.** *See also* § II Standard of Review at *2 in our prior opinion.

cedures further provide that if the entrant consents to the x-ray and if the x-ray does not reveal the presence of any foreign bodies, the entrant will be released. If the x-ray indicates the presence of foreign bodies, the entrant is detained in the hospital until either the foreign bodies are excreted or until it becomes clear that there are in fact no foreign bodies to excrete. (Government Exhibit 3, paragraphs H, M, N)

8. The Customs Service has identified Jamaica as a "source country" for smuggling drugs into the United States. Because of a large number of successful drug seizures on Continental Airlines flight 442 from Jamaica, the Customs Service has specifically designated that flight as "high risk" for drug smuggling. (T. at 82)

9. Defendant United States asserts that for high risk flights, "roving" Customs Inspectors walk the floor and randomly question as many passengers as possible. Plaintiffs assert that Inspectors decide who to search based on "profiles" which take into account factors officially condoned by U.S. Treasury Regulations.[3] Plaintiffs further assert that the primary factors in the profile to which they were matched were that they were young and hispanic. As noted in our discussion, numerous cases involving law enforcement personnel, including customs agents, make reference to the use of profiles.[4] Nevertheless, there has been no direct proof that a profile was used in the present case and we therefore find that one was not used. As noted in our prior opinion, Plaintiffs also conceded in their brief of July 10, 1995, p. 14, n. 3, that they did not challenge the initial decisions of the customs inspectors to stop and question them. (T. at 82, 159, 248)

10. After Mr. Garcia and Mr. Vazquez had retrieved their checked luggage at approximately 5:30 p.m., at or near the so-called Customs "choke point," U.S. Customs Inspector Domenico Calise approached Plaintiff Garcia and asked him for his Customs Declaration, identification and passport and escorted him to an examination table at the rear of the Customs hall, a few feet away. Inspector Calise was coordinator of the passenger analysis team at Newark in February, 1994, and trains other Customs Inspectors around the country in analyzing passenger and smuggling techniques. He has been involved in more than 50 drug seizures, 20 of which were on Continental flight 442 from Jamaica. At or near the same time, Inspector Sebastiano Faraone approached Mr. Vazquez. (T. at 83–85, 134–136)

11. Neither officer recalled seeing either plaintiff with anyone else at the time. Inspector Calise saw nothing unusual when he first approached Mr. Garcia and saw nothing unusual in his passport. He did not check the Treasury Enforcement Communication System (TECS) databank, which contains a wide breadth of data concerning known or suspected smugglers, for Mr. Garcia's name. At the examination table, Inspector Calise searched Mr. Garcia's luggage. That search revealed no contraband. During the search, Inspector Calise asked him questions concerning his trip. (T. at 20, 99–100, 118–19)

12. Inspector Calise grew suspicious when he learned that Mr. Garcia (1) had only a small amount of cash with him; (2) presented no explanation of how he was to get home to Bethlehem; (3) when asked how he obtained his ticket, replied he had given cash to "a guy"; (4) displayed nervousness (stepped back from the inspection table, provided "evasive" answer, and gave no eye contact); (5) was unable to identify the occupation of his traveling companion, Mr. Vazquez and (6) gave a conflicting story about the length of his stay, first telling the inspector that his stay in Jamaica was only

---

**3.** At the hearing on September 28, 1995 and in their submissions to this court, Plaintiffs have cited to page 55 of the Law Course for Customs Officers, an official publication of the Office of Chief Counsel, U.S. Customs Service Academy, permitting agents "to draw professional inferences based upon profiles" and specifying race and ethnicity as critical elements to consider when developing characterizations of arriving travelers. The United States maintains that none of the Customs Inspectors at Newark International were familiar with the quoted document and that none used profiles, race, ethnicity or age in their decisions to detain and search any passengers, including plaintiffs.

**4.** See *infra* note 8 concerning profiles.

four days but later changing his story to seven days. (T. at 103, 141, Government Exhibit 8, page 6).

13. On cross examination, Mr. Garcia clearly admitted that the inspector was confused about the length of his stay and that he told him he did not know if his traveling companion was working. Regardless of who was at fault in causing the confusion, the customs officer clearly did reasonably believe the story about the length of the visit was conflicting. (T. at 86–87, 121–23).

14. Mr. Garcia was subsequently directed to an examination room where Mr. Garcia was subjected to a pat down search. Although the search was negative, Inspector Calise continued to suspect Mr. Garcia of smuggling narcotics internally. His belief was based on the factors he articulated in his pat down form. (T. at 104–05)

15. Inspector Calise next sought and received authorization from supervisory Inspector Herbert Herter to conduct a strip search of Plaintiff Garcia. Mr. Garcia was then subjected to a full strip-search which required him to remove all of his clothing and to spread his buttocks for visual inspection. This search was witnessed by Inspector Kuntz. Although this search failed to uncover any contraband, Inspector Calise still suspected that Garcia was an internal carrier. (T. at 103–05, 107, 250, 253–54)

16. Inspector Calise requested and received approval from superiors to ask for Mr. Garcia's consent to be x-rayed. That request was made. At this point, pursuant to customs policy, Mr. Garcia could either consent to the x-ray or be detained for a monitored bowel movement. Plaintiff Garcia signed the consent form. He was then handcuffed and led out of the airport, and was apparently put in leg restraints, or shackles, at some point prior to being met with a wheel chair at the hospital. (T. at 27–28, 109)

17. Mr. Vazquez was also questioned by a customs officer soon after he claimed his luggage, at or near the customs choke point. Inspector Faraone asked Mr. Vazquez for his Customs Declaration, identification and travel documents. Mr. Vazquez gave him his declarations form, birth certificate and an affidavit from the airline and Inspector Faraone escorted him to an examination table which was a few feet away. Inspector Faraone searched Vazquez's luggage without finding any contraband. (T. at 53–53, 158–62, 194, Plaintiffs' Exhibits 15 and 16)

18. During the search of Mr. Vazquez's luggage, Inspector Faraone inquired into the purpose of Mr. Vazquez's trip. Mr. Vazquez stated that he had been on vacation. Inspector Faraone did not consult the TECS data bank for Mr. Vazquez's name. As Inspector Faraone noted, Mr. Vazquez (1) appeared extremely nervous; (2) evidenced high blood pressure; (3) did not adequately explain how he would get home with only $6.00 in his wallet; and (4) that he responded to the inspector's inquiry about the length of his stay, "a short period". Because this was Mr. Vazquez's first trip out of the country, Mr. Vazquez explained to Inspector Faraone that he had given his ticket to Mr. Garcia for holding. It was also determined that Mr. Vazquez purchased his ticket with cash which he had given to Mr. Garcia. (T. at 71, 73, 162–63. Government Exhibit 12, page 5).

19. At this point, Inspector Faraone suspected Mr. Vazquez of being an internal narcotics smuggler. He performed a pat-down search and filled out the pat down form. Although the search of Mr. Vazquez was negative, Inspector Faraone continued to suspect Mr. Vazquez of being an internal carrier. (T. at 168, 196)

20. Mr. Vazquez was directed to an examination room. Inspector Faraone sought and obtained Supervisory Inspector Herbert Herter's approval to conduct a strip-search. Inspector Faraone justified the detention and search beyond a pat-down because in addition to the initial four factors, he determined that Mr. Vazquez: (5) was bulky (it was later determined that Mr. Vazquez was wearing shorts under his jeans and a heavy sweatshirt under a leather jacket); (6) was unemployed; and (7) had paid cash for a ticket purchased by someone else. (T. at 200–01, 252–53).

21. Mr. Vazquez was then ordered to submit to the strip search, which required him to remove all of his clothing and spread his buttocks for visual inspection. Inspector

Faraone did not touch Mr. Vazquez during the search. The strip-search failed to uncover contraband. Nonetheless Inspector Faraone continued to believe that Mr. Vazquez was smuggling drugs internally. The inspector completed a search worksheet recording the following factors: source country travel, very nervous, short stay, unemployed for more than a year, airline ticket was paid for in cash and purchased by someone else. (T. at 200–01, 255, Government Exhibit 12, page 3).

22. Inspector Faraone sought and received approval from Supervisory Inspector Herter and his superior, Deputy Chief Inspector Robert Osgard, to request consent from Mr. Vazquez to be x-rayed. Inspector Faraone gave Mr. Vazquez an x-ray consent form, explained that he was suspected of possible internal narcotics smuggling, asked him to read the sheet and to sign it if he understood. At this point, pursuant to Customs policy, Mr. Vazquez could either consent to the x-ray or be detained for a monitored bowel movement. (T. at 201, 253–55)

23. Mr. Vazquez signed the form because he wanted to get home as soon as possible and he understood he would be detained whether he consented or not. Inspector Faraone then notified his supervisor that Mr. Vazquez had signed the form, necessitating transportation to the hospital for x-ray of a "possible swallower." Mr. Vazquez was handcuffed while still inside the examination room and led out of the airport. He was apparently put in leg restraints, or shackles, at some point prior to being met with a wheel chair at the hospital. (T. at 28, 58–60, 107–08)

24. Both men were transported to Saint Francis Hospital in Newark, New Jersey. They were admitted to the hospital's emergency room at approximately 7:00 p.m. Both were placed in a wheel-chair and further transported while under restraint to an emergency bedroom. They were then ordered to completely undress, supplied with a hospital bathrobe and handcuffed to their hospital beds. Their restraint was observed by individuals at the hospital. (T. at 29–31, 60–1)

25. Because of urgent medical activity in the emergency room that evening, there was a delay in taking the x-rays. During this time customs procedures were explained to the passengers. Two x-rays of Mr. Vazquez were taken at 7:57 and 7:58 p.m. Two x-rays of Mr. Garcia were taken at 8:06 and 8:07 p.m. Following negative x-rays, Mr. Garcia was informed that he was to be released. He was then un-handcuffed and allowed to dress. (T. at 148, 182, Plaintiffs' Exhibits 3 and 4)

26. Mr. Garcia maintains that at that point he asked Inspector Calise why they had been singled out and the inspector asked them their age and ethnicity. When he responded 25 and hispanic, Mr. Garcia alleges an officer stated "there you go," implying that those were the factors that triggered the officer's suspicion. The government denies these assertions and insists that the inspectors actions were based solely on the articulated factors substantiating their reasonable suspicion. Plaintiffs have the burden of proof, and in view of the threats which were made in finding of fact 33, we do not believe that this statement was made. Even if it was made, we do not believe that age or ethnicity were the true reasons for the actions taken. Mr. Garcia was released at 9:08 p.m. and transported back to the airport, approximately two hours after being taken to the hospital. (T. at 35, 63–64, 148. Government Exhibit 17)

27. Because of an emergency at the hospital, Mr. Vazquez's initial x-ray session was interrupted and he had to be brought back again for another view. Mr. Vazquez was subjected to the third x-ray at 8:46 p.m. and a fourth at 10:38 p.m. After the first set of x-rays, the doctor observed a shadow on Mr. Vazquez's x-ray and showed it to Inspector Calise before he left the hospital with Mr. Garcia. The doctor said he believed he saw a foreign body and the customs officers therefore held Mr. Vazquez. (T. at 148–49, 183, 290. Plaintiffs' Exhibit 5)

28. The hospital treatment record shows the physician diagnosis of "possible f.b. ingestion" by Mr. Vazquez. The doctor returned to the hospital room with the first set of x-rays and asked Mr. Vazquez what he had swallowed. A notation in the treatment

record shows that at 9:30 p.m. Mr. Vazquez was "to be held" and "repeat x-ray done." After the second set of x-rays, the same doctor returned to the room where Mr. Vazquez was being held and again asked Mr. Vazquez what he had swallowed. Inspector Faraone explained to Mr. Vazquez, in accordance with Customs policy, that in light of the positive x-ray, he would have to be detained until and if he had clear bowel movements. (T. at 74, 148–49, 216–17. Government Exhibit 15)

29. According to a notation in his admission record, Mr. Vazquez was given a laxative by hospital personnel at approximately 11:45 p.m. During this period, Inspector Faraone gave Mr. Vazquez a pair of gloves and explained that if any foreign bodies appeared in his stool, Mr. Vazquez would have to thoroughly clean each such foreign body himself.[5] Customs agents testified—and the United States concedes—that it is the policy of the Customs Service at Newark International to require suspects to search their stool in light of "chain of custody" concerns. The government nevertheless claims that Mr. Vazquez's testimony that he searched his own stool lacks credibility because of the inspectors' presence and the presence of the doctor and nurse. We find that he did indeed search through his own stool. (T. at 66–68. Government Exhibit 15)

30. Between approximately 12:50 and 1:05 a.m. on the morning of February 4, Mr. Vazquez had his first bowel movement; it was clear of foreign bodies. Inspector Faraone was surprised because the doctor had told him the x-ray was positive and because this was the first case he had encountered where, following a positive x-ray, the first bowel movement was negative. Mr. Vazquez's second bowel movement occurred between 1:20 and 1:35 a.m.; it too was clear. Inspector Faraone immediately requested a final x-ray after the second clear bowel movement pursuant to Customs procedures to ensure that no foreign bodies were present. (T. at 66–68, 186, 220, 292. Government Exhibits 15 and 18)

31. Mr. Vazquez was released from the restraints at approximately 1:35 a.m. as they waited for the final x-ray. Because of other emergency room activity, Mr. Vazquez was not x-rayed until between 2:20 and 2:30 a.m. The x-ray was again negative. Inspector Faraone then secured the discharge of Mr. Vazquez from the doctor pursuant to Customs procedures which do not allow release of the passenger without the doctor's approval. Inspectors Faraone and Pfirrman drove Mr. Vazquez back to Newark International Airport at approximately 3:00 a.m. (T. 187, 222–23, 259. Government Exhibit 3, Paragraph N, Government Exhibit 18)

32. Mr. Vazquez, like his companion and co-plaintiff, alleges that he asked Inspector Faraone why he was singled out. He asserts that Faraone replied that he "fit the profile"—a claim the government denies. We find that if this statement was made, it was only a short hand explanation for the factors which supported the x-rays and monitored bowel movements and not an explanation of the reason Mr. Vazquez was initially questioned. (T. at 68–69, 218, 287–88)

33. After Mr. Vazquez arrived at the airport, he joined Mr. Garcia and was met by others who drove them home. Before they left, profanity was shouted and threats were made to inspectors Faraone and Pfirrman. The inspectors filled out a formal incident log which records this incident. (T. at 47–48, 225, Government's Exhibit 19)

## III. DISCUSSION

As we stated earlier, the Supreme Court, in *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d. 381 (1985), found that a reasonable suspicion was necessary for the nonroutine detention of a suspected alimentary canal smuggler at the border but left open the question of what level of suspicion is necessary for the types of searches involved in the case before us. To date, the Third Circuit has not decided any case which provides such guidance. For this reason, we specifically directed the par-

---

**5.** There is some confusion whether Inspector Faraone actually observed Mr. Vazquez follow this procedure or merely instructed him how to do so. Trial Transcript, September 28, 1995, at 228–230.

ties to brief this issue. After reviewing the particular facts and circumstances of the case before us, as well as the decisions of other federal courts, we believe we have sufficiently resolved this issue.

We can not fail to observe that the events of this case occurred in the context of an increasing drug problem in the United States that has necessitated the development of heightened investigative methods and procedures. "Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances." *U.S. v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980). *See also Adedeji v. U.S.*, 782 F.Supp. 688, 692 (D.Mass.1992). Although it is not a pleasant subject, "As drug smugglers have become more ingenious, courts have also had to distinguish between different body orifices according to the indignity caused by peering into them." *U.S. v. Vega–Barvo*, 729 F.2d 1341, 1347 (11th Cir.1984).

■ We also note that the searches at issue in this case occurred at the international border where "the Fourth Amendment balance of interests leans heavily to the Government." *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 544, 105 S.Ct. 3304, 3312, 87 L.Ed.2d 381 (1985). *See also U.S. v. Vega–Barvo*, 729 F.2d 1341, 1344 (11th Cir.1984); *Mokwue v. U.S.*, 884 F.Supp. 228, 232 (N.D.Texas 1995). "Neither history nor con-

temporary concepts of dignity suggests to anyone that he will be free from official scrutiny on crossing an international boundary." *U.S. v. Guadalupe–Garza*, 421 F.2d 876, 878 (9th Cir.1970). We therefore approach this case with an understanding of the difficulties inherent in protecting our nation's border from an increasingly ingenious, if desperate drug trade.

■ "Unlike an actual or *de facto* arrest, an extended border detention of a suspected alimentary canal smuggler does not implicate the Fourth Amendment's warrant clause and, accordingly, does not require judicial approval." *U.S. v. Esieke*, 940 F.2d 29, 35 (2d Cir.1991), *cert. denied*, 502 U.S. 992, 112 S.Ct. 610, 116 L.Ed.2d 632 (1991). Whereas an incoming routine border search requires no articulable suspicion, "a non-routine search triggers the requirement of reasonable suspicion." *U.S. v. Ezeiruaku*, 936 F.2d 136, 140 (3d Cir.1991). Under the reasonable suspicion standard, border officials must have a "particularized and objective basis for suspecting the particular person of alimentary canal smuggling. *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 541, 105 S.Ct. 3304, 3311, 87 L.Ed.2d. 381 (1985); *U.S. v. Coggins*, 986 F.2d 651, 654 (3d Cir.1993); *U.S. v. Rickus*, 737 F.2d 360, 365 (3d Cir.1984).[6]

In response to this particularized and objective basis requirement, customs inspectors now routinely list the factors substantiating their suspicion.[7] The United States main-

---

**6.** *See also U.S. v. Adekunle*, 2 F.3d 559, 560 (5th Cir.1993); *U.S. v. Adekunle*, 980 F.2d 985, 988 (5th Cir.1992); *U.S. v. Guadalupe–Garza*, 421 F.2d 876, 879 (9th Cir.1970).

**7.** *See U.S. v. Montoya de Hernandez*, 473 U.S. 531, 533, 105 S.Ct. 3304, 3306, 87 L.Ed.2d. 381 (1985) (pat-down search justified by flight from Colombia, several recent trips, spoke no English, no family or friends in U.S., implausible reason for trip, $5,000 cash, no hotel reservations, could not recall how her airline ticket was purchased, small amount of clothing and one pair of high-heeled shoes, no checks, waybills, credit cards or letters of credit); *U.S. v. Sokolow*, 490 U.S. 1, 3, 109 S.Ct. 1581, 1583, 104 L.Ed.2d 1 (1989) (Reasonable suspicion where tickets purchased for $2,100 from a roll of $20 bills, passenger travelled under name that did not match the name under which his telephone was listed, original destination was Miami—a source city for illicit drugs, stay in Miami of only 48 hours after a 20-

hour flight from Honolulu, passenger appeared nervous during his trip and checked none of his luggage).

*See also Florida v. Royer*, n. 2, 460 U.S. 491, 493, 103 S.Ct. 1319, 1322, 75 L.Ed.2d 229 (1983); *U.S. v. Mendenhall*, n. 1, 446 U.S. 544, 547, 100 S.Ct. 1870, 1873, 64 L.Ed.2d 497 (1980); *U.S. v. Coggins*, 986 F.2d 651, 655 (3d Cir.1993); *U.S. v. Gonzalez–Rincon*, 36 F.3d 859, 863 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1323, 131 L.Ed.2d 203 (1995); *U.S. v. Adekunle*, 980 F.2d 985, 988 (5th Cir.1992); *U.S. v. Oba*, 978 F.2d 1123, 1128 (9th Cir.1992); *U.S. v. Onumonu*, 967 F.2d 782, 789 (2d Cir.1992); *U.S. v. Esieke*, 940 F.2d 29, 34 (2d Cir.1991), *cert. denied*, 502 U.S. 992, 112 S.Ct. 610, 116 L.Ed.2d 632 (1991); *U.S. v. Reyes*, 821 F.2d 168, 170 (2d Cir.1987); *U.S. v. Oyekan*, n. 11, 786 F.2d 832, 838 (8th Cir.1986); *U.S. v. Vega–Barvo*, 729 F.2d 1341, 1350 (11th Cir.1984); *U.S. v. Pino*, 729 F.2d 1357, 1359 (11th Cir.1984); *U.S. v. Kallevig*, 534 F.2d 411, 413 (1st Cir.1976); *Mokwue v.*

tains, and we have found, that the Customs Service at Newark International Airport does not use pre-established "profiles"[8] in deciding who to question, search or detain to carry out its mission at the Newark border.

We are alert to the danger that by merely listing several innocuous "factors" together law enforcement officers may support a "reasonable suspicion" in virtually every case. *See U.S. v. Sokolow*, 490 U.S. 1, 13, 109 S.Ct. 1581, 1589, 104 L.Ed.2d 1 (1989) (observing profile's "chameleon-like way of adapting to any particular set of observations.") Numerous courts have therefore deemed particular lists of factors insufficient to establish reasonable suspicion.[9]

▌ Additionally, some factors may well be subject to innocent interpretation. For example, the nature of air travel alone may induce the state of nervousness subsequently relied upon by border officials to justify a passenger's detention. *U.S. v. Berry*, 670 F.2d 583, 596 (5th Cir.1982). So too may other factors be "individually consistent with innocent travel." *Mokwue v. U.S.*, 884 F.Supp. 228, 232 (N.D.Texas 1995). None-

theless, in order to perform their crucial function of protecting our nation's borders, customs officers can not be subjected to "unrealistic second-guessing" by the courts. *Montoya*, 473 U.S. at 542, 105 S.Ct. at 3311. Although individually susceptible to innocent interpretation, when "considered together [by trained customs officers, those same factors] may amount to reasonable suspicion." *Mokwue*, 884 F.Supp. at 232.

▌ We conclude it is only sensible to allow customs officers to exercise the very judgment they have developed both individually and collectively. Clearly some latitude must be given. "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers." *U.S. v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *U.S. v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621

---

U.S., 884 F.Supp. 228, 234 (N.D.Texas 1995); *Velez v. U.S.*, 693 F.Supp 51, 57 (S.D.N.Y.1988).

**8.** Nevertheless, federal courts have routinely evaluated the propriety of federal drug agents' use of such profiles on several occasions. *See U.S. v. Sokolow*, 490 U.S. 1, 13, 109 S.Ct. 1581, 1588, 104 L.Ed.2d 1 (Marshall, J. dissenting) (1989); *I.N.S. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *U.S. v. Mendenhall*, 446 U.S. 544, 562, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980); *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (so-called "drug courier profile" is a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics); *U.S. v. Oyekan*, 786 F.2d 832, 834 (8th Cir.1986); *U.S. v. Vega–Barvo*, 729 F.2d 1341, 1349 (11th Cir. 1984); *Adedeji v. U.S.*, 782 F.Supp. 688, 695 (D.Mass.1992) (discussing a customs directive listing frequently encountered articulable factors). Webster's New World Dictionary, Third College Edition, Simon & Schuster, Inc. 1988 defines "profile" in this context as either "a short, vivid biographical and character sketch" or "a graph, diagram, piece of writing, etc. presenting or summarizing data relevant to a particular person or thing." We believe that the agents' use of particularized articulable factors differs somewhat from this definition because each fact situation can present new and unique factors.

**9.** *See Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity where passenger had arrived from Fort Lauderdale—a principal place of origin of cocaine sold elsewhere in the country, arrived in early morning, when law enforcement activity is diminished, appeared to be trying to conceal the fact he was traveling with a companion, and both travelers apparently had no luggage other than their shoulder bags); *U.S. v. O'Neal*, 17 F.3d 239, 240 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994) (evidence fails to demonstrate objectively reasonable, articulable suspicion justifying seizure of a bag where defendant got off a bus from a Chicago—"source city" for drugs, was a black male wearing a Chicago Bulls Starter jacket, walked "briskly" with his brother to the outer door leading to the parking lot rather than into the bus terminal, they were carrying "athletic-type" bags, stared at an officer who believed he looked apprehensive, lit a cigarette, when approached by officers was "sweating profusely" and appeared nervous); *See also U.S. v. Ortiz*, 835 F.Supp. 824 (E.D.Pa. 1993); *Adedeji v. U.S.*, 782 F.Supp. 688, 696–699 (D.Mass.1992); *U.S. v. Guadalupe–Garza*, 421 F.2d 876, 879 (9th Cir.1970).

(1981)). "Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices." *U.S. v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980); *See also Mokwue v. U.S.,* 884 F.Supp. 228, 232 (N.D.Texas 1995). Agent Calise's participation in over 50 seizures of drugs, including 20 from the same flight involved in this case, deserves the respect of this tribunal.

◼ As the Supreme Court has stated, "[t]he concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules ... In evaluating the validity of a stop such as this, we must consider the totality of the circumstances—the whole picture." *U.S. v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citations omitted).[10]

◼ The Third Circuit has most recently articulated its interpretation of the "totality of circumstances" test in *Karnes v. Skrutski,* 62 F.3d 485 (3d Cir.1995). The *Karnes* court concluded:

> It is not enough that law enforcement officials can articulate reasons why they stopped someone if those reasons are not probative of behavior in which few innocent people would engage—*the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.* This is a totality of the circumstances test.

*Karnes v. Skrutski,* 62 F.3d at 493 (emphasis added).

◼ We believe that the factors relied on together by the agents in this case do eliminate a substantial portion of innocent travelers. Both plaintiffs were traveling on a high

risk flight, from a known source country for drugs. Past searches of travelers from this source country and flight had successfully discovered drugs including drugs carried in the alimentary canal (see findings of fact 8 and 10). In the case of Mr. Garcia, agents also observed that (1) he had a small amount of cash; (2) he gave no explanation about how he was getting home; (3) when asked how he obtained his ticket, he stated that he had given money to "a guy"; (4) he was unable to identify his traveling companion's occupation; (5) he was extremely nervous; and (6) gave a conflicting response concerning the length of his stay (see finding of fact 12).

In the case of Mr. Vazquez, agents observed that (1) he was extremely nervous; (2) he evidenced high blood pressure; (3) he did not adequately explain how he would get home; (4) when asked how long was his stay, he replied "a short period"; (5) he appeared bulky; (6) he was unemployed; and (7) he paid cash for a ticket purchased by someone else (see findings of fact 18 and 20).

◼ A common goal of numerous courts has been the need to strike a balance between intrusions on individuals and the legitimate concerns for protecting our nation's borders. That balance has been struck in several ways. The *Montoya* Court focused on the length of detention in determining whether it was reasonably related in scope to the circumstances which justified it initially. *U.S. v. Montoya de Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985). *See also Adedeji v. U.S.,* 782 F.Supp. 688, 692 (D.Mass.1992) (each case requires balancing need for particular search against the invasion of personal rights the search entails) and at 699 (inspectors must be cognizant of factors which should have lessened their suspicion). A plurality of the Supreme Court has even required that law-enforce-

---

**10.** *See also U.S. v. Green,* 52 F.3d 194, 198 (8th Cir.1995) ("Reasonable suspicion must derive from more than an inchoate and unparticularized suspicion or hunch.") (citation omitted); *U.S. v. Gonzalez–Rincon,* 36 F.3d 859, 863 (9th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1323 (1995); *U.S. v. O'Neal,* 17 F.3d 239, 240 (8th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994) ("Reasonable

suspicion must be based on the particular facts known to the officer and the inferences rationally to be drawn from those facts, as viewed in the totality of the circumstances and in light of the officer's experience"); *U.S. v. Coggins,* 986 F.2d 651, 654 (3d Cir.1993); *U.S. v. Rickus,* 737 F.2d 360, 365 (3d Cir.1984); *U.S. v. Vega–Barvo,* 729 F.2d 1341, 1350 (11th Cir.1984).

ment officers employ the least intrusive means possible to verify or dispel their suspicions. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (concluding "It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure"). The Third Circuit has also required that investigative stops be reasonably related in scope to the justification for their initiation. *U.S. v. Rickus,* 737 F.2d 360, 365 (3d Cir. 1984).[11] As noted in finding of fact 13, the customs officer clearly reasonably believed that he had been given a conflicting story. Even though he may have been innocently mistaken, his actions were consistent with those of an objectively reasonable officer under a totality of the circumstances.[12]

Although we cannot reduce it to a "neat set of legal rules" we find that under the totality of the foregoing articulated and particularized factual circumstances a sufficient reasonable suspicion existed that plaintiffs were smuggling narcotics internally. Accordingly, the conduct of the customs officers

was within constitutional and common law bounds.

■ In addition to asserting that their detention exceeded the bounds of reasonableness, plaintiffs also maintain that the government as a whole owed them a level of reasonable competence, including the quality of medical treatment they were provided at the hospital.[13] The government explains that a doctor's approval is required for customs officers to release passengers who are admitted to the hospital.

■ We believe that there must be limits to what knowledge will be required of customs agents. Law enforcement officers are not doctors and should not be expected to be capable of contradicting or evaluating the expertise of medical practitioners. In this case, we conclude that the agents reasonably relied on the representations made to them by hospital personnel. We believe it would be inappropriate to second-guess that reliance here.[14]

■ We have found the conduct of the customs officers to be constitutional, and we are well aware that the safeguards which are

---

11. See also *U.S. v. Gonzalez–Rincon,* 36 F.3d 859, 864 (9th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1323, 131 L.Ed.2d 203 (1995) (once customs agents have reasonable suspicion, they may detain passenger and "perform the searches necessary to either verify or dispel the suspicion"); *U.S. v. Oyekan,* 786 F.2d 832, 837 (8th Cir.1986) (reasonable suspicion justified detention for strip search and, when the strip search proved fruitless, until involuntary x-rays could be performed); *U.S. v. Vega–Barvo,* 729 F.2d 1341, 1344 (11th Cir.1984) (adopting a "flexible test which adjusts the strength of suspicion required for a particular search to the intrusiveness of that search.") and 1348 (holding that an x-ray, while more intrusive than a frisk, is no more intrusive than a strip search); *U.S. v. Guadalupe–Garza,* 421 F.2d 876, 878 (9th Cir.1970); *Mokwue v. U.S.,* 884 F.Supp. 228, 232 (N.D.Texas 1995).

12. See *U.S. v. Gonzalez,* 969 F.2d 999, 1005 (11th Cir.1992) citing *U.S. v. DeLeon–Reyna,* 930 F.2d 396, 399–401 (5th Cir.1991) (reasonable suspicion for stop found when border agent relies on incorrect information), *U.S. v. Garcia,* 942 F.2d 873, 876–77 (5th Cir.1991), and *Brinegar v. U.S.,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the

mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Id.* 338 U.S. at 176, 69 S.Ct. at 1311.

13. See *Velez v. U.S.,* 693 F.Supp. 51, 57 (S.D.N.Y. 1988). (asserting customs officers should have made sure that passenger's x-ray was interpreted by a radiologist as soon as possible and reiterating that "this was not merely a failure on the part of the hospital, but a failure by the Customs Service.").

14. At the hearing on September 28, 1995 and again in their post-hearing memorandum of law, Plaintiffs attempted to introduce a transcript of a videotaped deposition of their medical expert, Dr. David C. Levin, of Thomas Jefferson University Hospital. That deposition questions the medical competence of the staff physician on duty on the night Plaintiffs were brought to Saint Francis Hospital in Newark. As we stated at the hearing, although we suspect that such incompetence, if any, might perhaps subject the hospital to liability under a theory of malpractice, we believe it is of no bearing to the state of mind of the customs agents on the evening of plaintiffs' detention. Accordingly, we denied at the hearing and today again deny plaintiffs' motion to introduce that deposition.

in place cannot guarantee that an innocent person will never be detained or searched. Indeed, the Constitution does not even guarantee that an innocent person will not be arrested. *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). We are also aware that so long as constitutional standards are met, it is not our function to set policy for the Customs Service. We are nonetheless concerned about two aspects of this matter.

■ Until the shouting match at the very end, both plaintiffs were fully cooperative and the government concedes that at no time did the inspectors have to use or threaten force to make the plaintiffs comply with them. The U.S. Customs Service Hospital Procedures for Internal Carriers at Newark International Airport (government exhibit 3) do not provide guidance with regard to the use of leg irons during transport. The procedures do provide that the "passenger is to remain handcuffed and observed at all times." We cannot help but wonder if this is necessary given the presence of two or more uniformed customs officers. Nevertheless, we accept the reasoning of the Court of Appeals in *U.S. v. Esieke*, 940 F.2d 29 (2d Cir.1991), *cert. denied*, 502 U.S. 992, 112 S.Ct. 610, 116 L.Ed.2d 632 (1991). In that case, the government explained that during a monitored bowel movement, suspect was forced to wear handcuffs and leg irons "because suspected narcotic smugglers present a potential threat to the customs inspectors as well as to themselves." *Id.* at 35. The *Esieke* court explored the implications of this reasoning in some detail:

> We certainly agree that law enforcement officials have a right to take reasonable steps to protect themselves regardless of whether probable cause to arrest exists. However, the use of handcuffs and leg irons strongly suggests that the detainees pose a very real and imminent threat of physical violence. While we need not decide whether such a risk is actually presented, we do take notice of the fact that the individuals being detained on suspicion of alimentary canal smuggling are subjected to strip searches, are clad solely in hospital gowns and presumably are in less

than peak physical condition. We therefore question whether the risk they pose is as extreme as the government imagines. Furthermore, it seems to us that the officials responsible for devising the detention procedures utilized at Kennedy Airport have approached their duties with an unwarranted degree of callousness and may have lost sight of the fact that the persons they detain are merely suspects who have not yet been—and may never be—charged with a crime.

> With this said, we are nonetheless unpersuaded that the use of handcuffs and leg irons converted an otherwise permissible detention in violation of the Fourth Amendment. Under ... *Montoya* ..., it clearly is permissible to detain incommunicado a traveler suspected of alimentary canal smuggling, against his or her will, in the confines of a guarded room, until the person has had a bowel movement. It is doubtful, although barely so, that the use of handcuffs and leg irons during such a border detention dramatically alters the Fourth Amendment analysis.

*Id.* (citations omitted).

We are additionally concerned by the Customs Service's policy requiring passengers to search their own stool. While we can appreciate the chain of custody concerns purely from an evidentiary standpoint, we must nonetheless express our discomfort with this revolting task within the context of the reasonable suspicion standard. In the recent Supreme Court decision, *Vernonia School Dist. 47J v. Acton*, —— U.S. ——, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) Justice O'Connor noted in her dissent:

> We have not hesitated to treat monitored bowel movements as highly intrusive (even in the special border search context), compare *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (brief interrogative stops of all motorists crossing certain border checkpoint reasonable without individualized suspicion), with *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (monitored bowel movement of border crossers reasonable only upon reasonable suspicion of

alimentary canal smuggling), and it is not easy to draw a distinction. See Fried, Privacy, 77 Yale L.J. 475, 487 (1968) ("[I]n our culture the excretory functions are shielded by more or less absolute privacy.")

*Id.,* —— U.S. at ——, 115 S.Ct. at 2400. *See also U.S. v. Adekunle,* 980 F.2d 985, 988 (5th Cir.1992); *U.S. v. Pino,* 729 F.2d 1357, 1359 (11th Cir.1984) (greater amount of suspicion is necessary to justify a rectal exam); *U.S. v. Vega–Barvo,* 729 F.2d 1341, 1345 (11th Cir. 1984) (virtually impossible to retain some degree of dignity during a rectal probe).

## IV.   CONCLUSIONS OF LAW

■ Consistent with the foregoing findings of fact, our prior opinion of August 18, 1995, and the discussion in our present opinion, we reach and state the following conclusions of law:

1. Under the particular facts and circumstances established in this case, a sufficient level of reasonable suspicion existed to support the actions taken by the customs officers.
2. The conduct of the customs inspectors was within constitutional bounds and both prongs of the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a) are satisfied.
3. Plaintiffs have not met their burden of proof in showing that we have jurisdiction to hear this matter under the Federal Tort Claims Act.

An appropriate order follows.

### *ORDER*

AND NOW, this 31st day of January, 1996, consistent with our prior opinion, the foregoing opinion, and after a full hearing on September 28, 1995, we have again considered defendant's motion for judgment, filed June 21, 1995. Upon said consideration, it is hereby ORDERED that said motion is GRANTED and this matter is dismissed under F.R.C.P. 12(b)(1) for want of subject matter jurisdiction. This case is closed.